THOMAS M. HOYT *vs.* NORTHERN MAINE FAIR ASSOCIATION.

Aroostook.     Opinion September 23, 1922.

*The driver of a racing horse which has been advertised and accepted by a Fair Association to furnish entertainment for its patrons on a given day, is entitled to a reasonably safe track upon which to drive said race horse at speed, and also during the time necessarily employed in "working out" the horse.*

In the instant case was the plaintiff at the time of the accident a mere licensee or an invitee.

If an invitee, was the defendant's negligence the proximate cause of the accident.

If so, was the plaintiff guilty of contributory negligence.

*Held:*

That Willard, the driver, was an invitee while working out his horse and entitled to a reasonably safe track.

That the defendant's negligence was the proximate cause of the accident.

That Willard, the driver, was not guilty of contributory negligence.

On general motion for a new trial. This is an action on the case to recover damages for injuries sustained by one John N. Willard, the driver of a trotting horse in races held by defendant on the fourth day of September, 1919, who was at the time of the injuries in the employ of plaintiff, who was an assenting employer under the Workmen's Compensation Law of Maine, having paid compensation, claimed to be subrogated to the rights of said John N. Willard, alleging negligence on the part of defendant. The case was tried before a jury and a verdict in the sum of forty-eight hundred dollars was returned for plaintiff, and defendant filed a general motion for a new trial. Motion overruled.

The case is fully stated in the opinion.

*W. R. Roix and Charles P. Barnes*, for plaintiff.

*W. R. Pattangall and Herbert T. Powers*, for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, MORRILL, WILSON, JJ.

SPEAR, J. This is an action on the case brought to recover of the defendant, the Northern Maine Fair Association, damages for injuries alleged to have been inflicted upon and suffered by John N. Willard, the driver of a trotting horse entered for the races on the fourth day of September, 1919, and in the employ of the plaintiff, through and owing, to the negligence of the defendant corporation, or its servants and agents.

The plaintiff, as employer of the injured John N. Willard, and an assenting employer under the Workmen's Compensation Law of Maine, having paid compensation, and having become liable for compensation to the said John N. Willard, claims to be subrogated to the rights of said John N. Willard, his injured employee, to recover by this action for said injuries, under Sec. 26 of Chap. 238 of the Public Laws of 1919, the Workmen's Compensation Law of Maine as in force on the day of the accident.

The plaintiff in this case, Thomas M. Hoyt, of Presque Isle, on the fourth day of September, 1919, the date of the accident as alleged in the writ, was the proprietor of a large stable of racing horses, among which was a horse known as Royal McKinney, quartered at the track of the defendant corporation, and entered for a race to be run at one o'clock P. M. on said fourth day of September.

John N. Willard was a driver and trainer of race horses, a man of long experience in that line of work, a resident of Presque Isle and familiar with everything connected with the Presque Isle race track and the fairs conducted on that race track.

The defendant corporation was the owner of the race track and fair grounds at Presque Isle and conducted fairs and race meetings there.

The injury complained of was caused by Willard while exercising or "working out" a horse called Royal McKinney coming in collision, on the track, with an automobile which was on its way, across the track, to the inner enclosure of the park.

The arrangement of the grounds was as follows: A fence enclosed the whole area of the fair ground; inside that, a circular fence enclosed the race track, this fence following the outer edge of the track; inside of that another circular fence, following the inside edge of the track enclosed the oval which made up the larger part of the fair ground not devoted to track, grand stand and other buildings. It was the custom on fair days to park autos in this oval until it was filled. In order that autos and foot passengers might reach the oval there were two sets of gates provided one at each end of the grounds. First, a gate through which access was had to the fair ground; second, a gate in the outer circular fence; third, a gate in the inner circular fence. The track was oval rather than circular and the gates were at the ends of the oval.

Willard collided with the automobile at a point between the two gates in the circular fences at the end of the oval between the first and second turns on the track about half way from the starting wire and the quarter pole. The collision occurred at approximately 12:30 P. M., the time of racing being set at 1:00 P. M. Prior to the accident, Willard had jogged his horse five or six times around the track, the wrong way of the track, that is, in the opposite direction to that taken when racing. He had then turned and started working his horse somewhat more rapidly, the right way of the track. On the third time around he approached the first turn in the track, going at the rate of about a mile in 2.25 and occupying a position about ten feet from the pole or inside edge of the track.

The gate in the outside circular fence had been opened to admit autos. The defendant had a man named Greenwood stationed near the first turn, where he could observe both the horse coming down

the stretch and the gates at end of the oval. Greenwood was pro-
vided with a flag and his duty was to signal the gate keeper with it
so that the gates might be closed when necessary. Greenwood saw
Willard and Royal McKinney coming toward the turn and signalled
to close the gate. When he signalled an auto was partly or wholly
through the gate and on the track. Other autos were so close behind
it that it was impossible for it to back up. It stopped. James
Burgoine, another employee of defendant was tending the inside
gate. He signalled the auto to stop. It did stop. Willard saw it
standing near the outside edge of the track about two hundred feet
away. He had room enough to go between the auto and the inside
fence and kept on driving. His horse was notoriously hard to control
so far as stopping him was concerned and he knew that fact. He was
travelling at the rate of approximately thirty-six feet per second.
The track where the auto was standing was forty-three feet in width.
The automobile occupied the space of its length, of course, or approxi-
mately ten feet. It was just inside the outer circular fence when
Willard saw it. If it remained stationary he had room to pass
between it and the inside fence. But just before he reached that
point and when it was too late for him to stop his horse, the auto
started up and although he pulled in close to the pole it closed up
enough of the gap so that he could not get through, he struck it, was
thrown out and received the injuries, which are the basis of the suit.

Upon the foregoing statement of facts the plaintiff claims that the
driver of a racing horse advertised and accepted by the defendant
Fair Association to furnish entertainment for its patrons on a given
day, is entitled to a reasonably safe track upon which to drive said
race horse at speed, not only during the few minutes of a heat, but
during all the time necessarily employed to work out the horse, and
that the track between the gates, during such times as the drivers of
race horses must of necessity be driving them at speed, shall be so
guarded as to be and shall be reasonably safe for such drivers. On
the other hand the defendant contends that at the time the plaintiff
was exercising his horse on defendant's track, prior to the race, he
was a mere licensee. Thus the issue is joined. There is no conflict
of the evidence upon the decisive points in the case, nor has any law
been found bearing directly upon the state of facts here involved.

Under the above contentions three principal questions arise:

1.  Was the plaintiff at the time of the accident a mere licensee or an invitee?

2.  If an invitee, was the defendant's negligence the proximate cause of the accident?

3.  If so, was the plaintiff guilty of contributory negligence?

Under the circumstances of this case can it be properly held that Willard, with the horse McKinney, was a mere licensee? We think not. To determine this question it may be useful to take into consideration a general view of the scope, purpose and management of the occasion, in connection with which this accident occurred, all of which may be regarded as matters of common knowledge. That occasion was the holding by the defendant of an agricultural fair on its grounds and premises in the town of Presque Isle. Similar fairs for similar purposes under similar auspices are held in a large number of towns each year in this State. Everybody knows what an agricultural fair means and how it is conducted. Its scope is an advertised invitation for the whole countryside to attend. Its purpose is to invite and induce exhibits of the products of the farm, including the dairy, live stock, poultry, vegetables of all kinds, embroidery of the housewife, viands of the culinary department, inventions, machinery, musical instruments and many other things raised upon the farm or manufactured in the shops.

Usually farm exhibits are examined by committees and classified for premiums offered by the proprietors of the fair. It is a matter of common knowledge that all these farm exhibitors are invitees. They are not only invited, but receive a reward for premium exhibits, and all those who enter the grounds for an admission fee are invitees. *Thornton* v. *Agri. Soc.*, 97 Maine, 108.

Within the scope and purpose of the larger fairs is included another class of exhibitors invited for precisely the same purpose as those named, and, an important purpose of inviting this class is to offer such attractions and exhibitions as will appeal to the sporting sense of the public and to allure them to the fair grounds to witness the sports of the day. This class of exhibitors is composed of the horsemen, who come to exhibit their horses in the races and unquestionably furnish by far the most attractive display of the entire exhibition and become the most important source of revenue, a consideration not only desirable but essential to the success of most large fairs.

While the exhibition of farm products, dairy products and the other results of good husbandry and of the equestrian department,

including draught, family and trotting horses, for premiums are the visual features of the fair, it is nevertheless true that the underlying conception is the establishment and operation of these institutions for the purpose of stimulating an interest and arousing increased activity in all the departments of agricultural opportunity, including all classes of horses as well as all classes of other live stock. Of all these exhibitions good, clean contests of speed between well-prepared horses, are among the most wholesome and satisfactory and easily the drawing card.

The owner of every horse entered in a race is required to pay an entrance fee based upon a certain percentage of the premium for which his horse competes. In the present case the entrance fee was twenty-five per cent. of the stake. The people who are invited and pay their money for entrance to the fair and, in addition to the grand stand, are entitled to the right as well as the privilege of witnessing a genuine contest of speed. They are entitled to a guarantee on the part of the management that it will use every reasonable effort to promote such a contest. It is, therefore, evident that it is incumbent upon the management to furnish every reasonable facility the grounds and track will admit, not inconsistent with the successful operation of the fair, for the preparation of the horses for the races.

We are inclined to the opinion that it is a matter of common knowledge, that the management of all fairs where racing is a feature sanction, as a common custom, the practice of the drivers "to work out" their horses, at all times before and after the racing periods. Whether it be so or not, it is proved beyond controversy in this case that it was, and has been the common custom, upon the Presque Isle track for at least twenty-five years "to work out" the horses for a race just as Willard was working out McKinney.

Before quoting Willard upon this point it may be observed that no witness, expert or lay, and no member of the corporation or management of the fair, took the stand to contradict or modify his testimony in any respect in regard to the custom and manner of using the track before, during or after a race. With reference to the manner and time of the use of this track Mr. Willard testified as follows:

"Q. Which race was to be called at one o'clock?  A. The fourteen class. The class that this horse was to go in. . . . . .

"Q. With this knowledge how did you prepare Royal McKinney that day for the 2.14 class race?  A. Had him fed at eleven

o'clock. Told the man that took care of him to have him ready to go out from ten or fifteen minutes past twelve, so that I could commence to work him, and he was hitched to the sulky about that time, and I went out with him. I usually jog such a horse as him about three miles or three and one half before I turn them to go the other way of the track. I jogged the horse about three miles at this time. . . . Q. How many years have you raced on the Presque Isle track? A. Well, I have raced every year but two for twenty-seven or eight years. . . . Q. What has been the custom for drivers in all these years that you have raced on the track about going on the track before the races and working out their horses? A. Well they have always gone out the same as I told you, and stayed." The phrase "as I told you" evidently refers to the previous answer in which he said at the beginning "had him fed at 11 o'clock," and ordered him to be ready a few minutes past twelve. In this connection he further testified:. "Q. Now on this day of the accident, did any official of the Northern Maine Fair Association object to your driving on the track before the races? A. No, they didn't object to my driving there that I know of. Q. I mean in working out. Now in all your experience of the number of years you stated that you have driven on that track, has there ever been any objection to driving horses and "working out" just before the races? A. No."

In the present case it then appears that it has been the common custom upon this track for the drivers to "work out" their horses before the races in which they were engaged, for a period of twenty-seven years at least with the full knowledge and acquiescence of the management.

At this point it may be proper to add that we do not wish to be understood as saying that the managers of fairs are under obligation to allow or continue a custom even of so many years. They have the control of the track and can make such reasonable rules and regulations as they see fit. But, when they have made no prohibitive rule or objection to the observance of a custom for a period of twenty-seven years and have allowed and sanctioned it without question, verbal or written, but on the other hand have made regulations in support of it, by stationing guards at the gates and a signal man to give notice, they must be held to have acquiesced in such use. Mr. Willard also testified that it was necessary to give a horse a fast mile before he goes into the regular race.

We are of the opinion that under the circumstances of this case the exhibitors of horses for the race should be classed in the same category as the exhibitors of live stock for the premium and must be regarded as invitees under the rules of law, not only while engaged in the regular race but when working out their horses in accordance with the usual practice and common custom observed upon this track. We cannot avoid the conclusion that Willard was lawfully upon the track, as an invitee, when he was injured.

But, notwithstanding the foregoing facts, the defendant contends that Willard was a mere licensee. The distinction between a licensee and invitee is clearly drawn, both in our own and other jurisdictions. One of the earlier cases that most fully and clearly discusses the question is *Sweeney* v. *Old Colony and Newport Railway Co.*, 10 Allen 368, in an opinion by Chief Justice Bigelow in which he said:

"In order to maintain an action for an injury to person or property by reason of negligence or want of due care there must be shown to exist some obligation or duty towards the plaintiff, which the defendant has left undischarged or unfulfilled. This is the basis on which the cause of action rests. There can be no fault, or negligence, or breach of duty, where there is no act, or service, or contract, which a party is bound to perform or fulfill. . . . . So a licensee, who enters on premises by permission only, without any enticement, allurement or inducement being held out to him by the owner or occupant, cannot recover damage for injuries caused by obstructions or pitfalls. . . . On the other hand, there are cases where houses or lands are so situated, or their mode of occupation and use is such, that the owner or occupant is not absolved from all care for the safety of those who come on the premises, but where the law imposes on him an obligation or duty to provide for their security against accident and injury. . . . . The general rule or principle applicable to this class of cases is, that an owner or occupant is bound to keep his premises in a safe and suitable condition for those who come upon and pass over them, using due care, if he has held out any invitation, allurement or inducement, either express or implied, by which they have been led to enter thereon. A mere naked license or permission to enter or pass over an estate will not create a duty or impose an obligation on the part of the owner or person in possession to provide against the danger of accident. The gist of the liability consists in the fact that the person injured did not act merely for his own con-

venience and pleasure, and from motives to which no act or sign of the owner or occupant contributed, but that he entered the premises because he was led to believe that they were intended to be used by visitors or passengers, and that such use was not only acquiesced in by the owner or person in possession and control of the premises, but that it was in accordance with the intention and design with which the way or place was adapted and prepared or allowed to be so used. The true distinction is this: A mere passive acquiescence by an owner or occupier in a certain use of his land by others involves no liability; but if he directly or by implication induces persons to enter on and pass over his premises, he thereby assumes an obligation that they are in a safe condition, suitable for such use, and for a breach of this obligation he is liable in damages to a person injured thereby."
*Graffam, Admx.* v. *Saco Grand Patrons of Husbandry*, 112 Maine, 508, is an action for the death of a boy brought against the defendant, alleging that defendant while conducting an agricultural fair on the fair grounds, allowed a person to erect and run a shooting gallery in which a 22-calibre repeating rifle was used and by the alleged negligent use of which the boy was killed. In this case the court says: "It is too well settled to need the citation of authorities, that if the owner or occupier of land either directly or by implication induces persons to come upon his premises, he thereby assumes an obligation to see that such premises are in a reasonably safe condition so that the persons there by his invitation may not be injured by them or in their use for the purpose for which the invitation was extended. . . It was its (the defendant) duty to use reasonable care that there should be no traps or pitfalls into which the invited might fall, and that there should be no dangerous plays or sports, or exhibitions, by which the invited might be injured."

We are of the opinion that the evidence clearly and fully brings this case within the rule of invitee under the distinction between a licensee and invitee as laid down in the *Sweeney Case*, 10 Allen, 368, and followed by our own court in several cases. Paraphrasing the language of Page 373 under what is called the "gist of the liability," the plaintiff in the present case "did not act merely for his own convenience and pleasure and from motives to which no act or sign of the owner or occupant contributed, but that he was working out his horse because he was led to believe that the management intended the track to be so used by the horsemen and that such use was not

only acquiesced in by the management but that it was in accordance with the intention and design with which the track was adapted and prepared or allowed to be used."

Upon the conclusion that the plaintiff was an invitee it then follows that the defendant owed him the duty of reasonable care while he was working out his horse as it did to every other invitee. In *Thornton v. Agricultural Society,* 97 Maine, 108, speaking of the duties of the proprietor of a park to which the public had been invited and for entering which an admission fee was charged it was held "Having invited the public to its park, it was chargeable with the duty of using reasonable care to see that the premises were kept in a safe condition for the use of its guests; and if the exhibition, although given by an independent contractor, was of a character to jeopardize the saftey of those who were present on the defendant's invitation, the duty was cast on the latter of taking due precautions to guard against injury." There are also numerous citations to the same effect.

The defendant further contends, however, even admitting that the plaintiff was an invitee and lawfully upon the track that there was not sufficient evidence to warrant the jury in the finding that the defendant was negligent. In determining this question the jury of course, had a right to give full credit to the plaintiff's evidence and to rely upon it in arriving at a conclusion. In fact, however, there is no appreciable discrepancy between the plaintiff's testimony and that of the few witnesses put on for the defendant. Accordingly the unquestioned evidence shows that the defendant knew that the plaintiff was upon the track somewhere from fifteen to twenty minutes past twelve o'clock, working out his horse according to the usual custom; and for the purpose of protecting him and the public, who had been admitted to the premises, against danger while the horses were upon the track, had established sliding gates at the upper turn and the lower turn of the track and stationed guards at the lower gates at least, and a flagman at the sharp turn in order that he might observe the horses as they approached the wire and signal the gatemen in appraisal of the fact that a horse or horses were coming. The plaintiff's driver, Willard, had full knowledge of these precautions and their purpose and had a right to rely upon the fidelity of the gatemen to protect him against injury from negligence in opening the gates. That the management of the fair clearly understood the

purpose of the gates and recognized the necessity of properly attending them is clearly shown by one of the defendant's witnesses, who substituted for another gateman at the dinner hour, who testified as follows: "Q. Why were you there while somebody went to get his dinner? A. I think I was. Q. Who placed you there? Who stationed you there? A. Mr. Merritt. Q. What instructions did he give you about the gate? A. He told me to keep the gate shut during the horses' working on the track."

THE COURT: Who is this Merritt? "Q. Mr. Merritt is superintendent of the horse racing? and is that Mr. Merritt a marshal that is on horse back? A. Yes, sir."

It should be here noted that this instruction was to keep the gate shut during the horses working out. His evidence further shows that the gateman at this particular gate was at his place and the flagman at his station. They were cognizant or in the exercise of due care should have been, of the presence of Willard with the horse McKinney upon the track; and Willard says that he noted that the gatemen were at their places. Everything, therefore, seemed to be in perfect working order. Under these conditions, Willard having jogged this horse for three or three and one half miles, then prepared as was the practice for entering the regular race, to drive him a couple fast miles as he calls them. In jogging the horse he went the wrong way of the track, but going the fast miles he turned his horse and went the right way of the track. When he concluded to turn his horse for the fast miles he took the precaution of notifying the gatemen that he was going to make the fast miles. He then made the first mile without any interference; the track being a half mile, had to be circled twice to make a full mile. After having gone the full mile this is what happened, as stated in the language of Willard: "I went down and turned the horse around and when I went back to go the one towards the second mile I says, 'We are going again' when I went by the gate. I went down and turned the horse around, and when I got up it was all clear, and I was out in about second horse place. I went around once and when I come around again I heard a horse behind me, which made my horse take hold more."

In order to determine just what the character of the gateman's act was in letting an automobile upon the track when he did, it is necessary to analyze the time of the mile, the position of the plaintiff when the gate was opened, the distance between the horse and the gate at

that time, and the time the gateman would have been required to wait for the horse to have passed the gate in making a second circuit of the track. The horse was going at the rate of a mile in 2.25; that is a little over thirty-six feet per second. It is already stated by Willard he went up above the wire, turned his horse taking a position about ten feet from the fence, and started his second fast mile, driving directly past the flagman and the gatemen on each side. of the track. They knew he had gone by for a fast mile heat. In circling the track for the first half mile and coming to the wire he met with no impediments. When he passed the wire, he was on the second half mile. If his time was even throughout the heat, he would have consumed about a minute and twelve seconds in coming to the wire, a fact which the gatemen, both upon the outside and inside knew, or should have approximately known. But within six seconds of that time when they knew that this horse was making a fast mile, and when the horse was then within six seconds of the gate, this outside gateman opened the gate and let two automobiles at least, past in upon the track.

The defendant, however, contends that it was not the opening of the gate, but the stopping and starting of the automobile after it had been let in upon the track which was the proximate cause; but this is too fine a refinement. If the gate had not been opened at this critical moment, all would have gone well. We are of the opinion that the jury had sufficient affirmative evidence to warrant them in finding that the defendant's agent at the gate was guilty of negligence.

Admitting the negligence of the defendant, the defendant again claims that the plaintiff should not recover because the driver of the horse was guilty of contributory negligence. This claim is based upon the contention that the driver after he first saw the automobile standing upon the track, just inside the gate about one hundred and fifty feet away, could have stopped his horse before reaching the automobile if he had made an effort to do so. This presented a question of fact to the jury and we think they are warranted in finding from all the evidence, first, that this horse as described by the plaintiff could not have been stopped within that distance. On direct examination, instead of saying that the horse could have been stopped as defendant claims in his brief, the plaintiff testified, "A horse like him, if you took right into him, you wouldn't get him slacked away any before he went eight or ten rods. I couldn't do it anyway." But upon

cross examination he finally says that it would be his best judgment that he could have stopped the horse within the distance. Upon this testimony alone, however, considered in connection with the other testimony describing the horse in the language of the defendant's brief, "as the horse notoriously hard to control so far as stopping him was concerned," the jury could not be said to be without sufficient evidence to warrant the conclusion that the horse could not be stopped in the distance stated. But even if that was so, we think the plaintiff's statment of what happened when he saw the automobile was sufficient to authorize the jury in finding that the driver was not guilty of contributory negligence. With reference to a question of whether he could have stopped the horse, he answered yes, and then follow these questions and answers: "Q. And got rid of any accident, but in your opinion as you viewed it the auto was standing still and you thought it was going to continue stand still? A. Yes, I thought they was holding it for us to work. There was two of us working, one behind the other, and they knew we was working. Q. What? A. And the men at the gate knew we were working."

We think there was sufficient evidence to warrant the jury, if it was their judgment, to find that Willard had a right to believe that the gateman, knowing that he was coming, had stopped the auto for the express purpose of enabling him to pass. Upon the evidence we are of the opinion that the verdict cannot be disturbed upon the question of contributory negligence.

This brings us to the question of damages. This is a question peculiarly within the province of the jury. The evidence shows that Mr. Willard was severely injured and endured great pain and suffering. These constitute elements of damage which it is always difficult to assess, and unfortunately, there is no fixed rule or regulation upon which they can be determined. We think the jury were authorized to find in addition to his pain and suffering that Mr. Willard, to a certain extent, was permanently injured. We do not feel authorized to say that our judgment should be substituted for that of the jury.

*Motion overruled.*